**Richard BOONE, Plaintiff,**

v.

**AERONCA, INC., Defendant.**

**No. C–C–86–406–P.**

United States District Court,
W.D. North Carolina, C.D.

Sept. 28, 1987.

1354

John H. Hasty, Waggoner, Hamrick, Hasty, Monteith, Kratt, Cobb & McDonnell, Charlotte, N.C., for plaintiff.

Ward McKeithen, Thomas B. Griffith, Robinson, Bradshaw & Hinson, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's, Aeronca, Inc. ("Aeronca"), and Plaintiff's, Richard Boone ("Boone"), Motions for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Aeronca asserts that, as a matter of the State of Ohio's substantive contract law, Boone is not entitled, under the terms of a Sales Representative Agreement, to a commission on a $170,000,000

military procurement contract awarded to Aeronca by the United States Government in September 1984. For the reasons that follow, Aeronca's Motion will be granted.

## BACKGROUND FACTS

The following material facts appear from the pleadings and depositions submitted by the parties. Boone is an individual citizen of Georgia, and Aeronca is an Ohio corporation domesticated under the laws of the State of North Carolina doing business in Charlotte, North Carolina.[1] On March 21 and 22, 1983, Boone and S.M. Ehlinger, who was a vice-president, general manager, and representative of Aeronca, executed in Ohio a document entitled "Sales Representative Agreement" ("the Agreement").[2] The Agreement and its terms form the center of the present controversy between the parties.

Under the terms of the Agreement, Boone was to serve Aeronca as an independent contractor with a non-exclusive, non-assignable right to assist Aeronca in its sales efforts in a seven state territory that included Mississippi, Alabama, Georgia, Florida, South Carolina, North Carolina, and Tennessee.[3] The Agreement was to go into effect March 1, 1983, and it was to run for a term of one year from the date of its execution.[4]

After the Agreement was executed, Boone worked for Aeronca in accordance with the Agreement's terms, and he called upon existing Aeronca accounts and solicited new and other business for Aeronca.[5] Thereafter, in a letter dated December 27, 1983, an employee of Aeronca, L. Wayne Snider, informed Boone that Aeronca had elected to terminate the Agreement as of January 27, 1984, pursuant to Paragraph

1. Complaint at ¶¶ 1, 2, *Boone* (C–C–86–0406) [hereinafter Complaint]; Answer at ¶¶ 1, 2, *Boone* (C–C–86–0406) [hereinafter Answer].

2. Answer at ¶ 4; Deposition of Richard Boone Taken on February 18, 1987 at 12–13, 20, *Boone* (C–C–86–0406) [hereinafter Boone Depo.]; Deposition of Steven Ehlinger Taken on May 7, 1987 at 11, *Boone* (C–C–86–0406) [hereinafter Ehlinger Depo.]

3. Answer Exhibit A at ¶ 1 (copy of the Agreement); *see* Complaint at ¶ 4 (stating that the sales territory included these seven states plus Louisiana and Virginia).

4. Answer Exhibit A at ¶¶ 7.A, 7.B; Boone Depo. at 21.

5. Complaint at ¶ 7; Answer at ¶ 7.

7.B of the Agreement.[6] The letter explains that Aeronca was terminating the Agreement because the southeastern United States sales territory had not been nor would be productive for either Aeronca or Boone.[7] The letter also states that according to Aeronca's records the only commission Boone had earned under the Agreement was one for an engine flaps contract from Pratt and Whitney.[8]

On or after January 30, 1984, after the termination date of the Agreement, Aeronca received a Survey for Potential Offerors from the Department of the Air Force.[9] The Air Force sent this document to Aeronca and others in order to inform them that a Request for Proposals ("RFP") on certain C-141 aircraft spare parts would be issued in the future.

The C-141 is a four-jet engine, military heavy transport plane built by Lockheed and purchased and used by the Air Force.[10] The C-141 has certain parts called aft cowl doors that are used to cover the jet engines, and they provide access for maintenance to the jet engines. The aft cowl doors are more prone to require replacement than other parts of the C-141, and so spares are needed.[11] A single source, Rohr Manufacturing ("Rohr"), traditionally made these spare aft cowl doors for the C-141.[12]

On or about March 14, 1984, Aeronca received a solicitation for bids to produce the aft cowl doors.[13] On July 13, 1984, Aeronca submitted an offer to produce the aft cowl doors for a firm fixed price.[14] Thereafter, the Air Force and Aeronca exchanged correspondence on the bid until on or about September 24, 1984 when the Air Force accepted Aeronca's bid to produce the required number of aft cowl doors for a total price of $17,061,318.[15] In a letter dated April 22, 1985, H.L. Brundage, Vice President for Marketing for Aeronca, notified Boone that, under the terms of the Agreement, he was not entitled to any commission for the C-141 aft cowl doors.[16] Thereafter, on September 3, 1986, Boone filed the present suit in this Court seeking a one percent commission on the aft cowl door contract. He alleges that Aeronca owes him approximately $170,000 under the terms of the Agreement.[17]

## THE COMPLAINT

In his Complaint, Boone asserts that Aeronca hired him to work as a "break-out" specialist in the aircraft and aerospace industry.[18] A "break-out" basically works in this way: The Government often procures an entire military aircraft program, like the C-141, from a single industrial manufacturer. That manufacturer is called a prime contractor or a sole-source. A "break-out" occurs when the Government identifies elements of that program as capable of being produced by manufacturers other than the sole-source. These suitable elements are then presented to industry as the subject of secret competitive bidding. If a bid to produce these aircraft elements is accepted from a manufacturer capable of doing the necessary, and often highly complex, engineering, tooling, and production, then these elements of the original military program have been "broken-out."[19] The Govern-

6. Ehlinger Depo. Defendant's Exhibit 2; Boone Depo. Defendant's Exhibit 6.

7. Boone Depo. Defendant's Exhibit 6; *see also* Ehlinger Depo. at 18–19; Deposition of Wayne L. Snider Taken on April 1, 1987 at 30, *Boone* (C–C–86–0406) [hereinafter Snider Depo.].

8. Boone Depo. Defendant's Exhibit 6.

9. Ehlinger Depo. Exhibit 3; Snider Depo. Defendant's Exhibit 7; Snider Depo. at 17; Boone Depo. Defendant's Exhibit 7.

10. Ehlinger Depo. at 14; Boone Depo. at 33–34.

11. Ehlinger Depo. at 14–15; Boone Depo. at 34.

12. Boone Depo. at 34.

13. Ehlinger Depo. Exhibit 4; Boone Depo. Defendant's Exhibit 8.

14. Boone Depo. Defendant's Exhibit 9.

15. Id. Defendant's Exhibit 10.

16. Ehlinger Depo. Defendant's Exhibit 8.

17. Complaint at ¶ 14.

18. Complaint at ¶¶ 1, 6–7.

19. Ehlinger Depo. at 12–14; Boone Depo. at 60–72.

ment can reduce the cost of a program through the process of breaking-out some of its component parts.

According to Boone, the above description of a break-out is far too simple. Instead, Boone asserts that a break-out is the result of various governmental and non-governmental groups and individuals communicating with each other and coordinating their efforts: Industry, the Small Business Administration, and the Air Force's Competition Advocacy Group are all players in this bureaucratic mechanism.[20] Boone alleges that Aeronca received the broken-out C–141 aft cowl door contract because, as Aeronca's sales representative, he worked closely with the governmental players involved in breaking-out the aft cowl doors.[21]

Boone alleges that on or about January 13, 1984, Aeronca agreed to pay Boone one percent of the C–141 aft cowl door contract price if Aeronca obtained the contract, even though his sales representative status would end on January 27, 1984.[22] Boone asserts that Snider, in a telephone conversation with Boone, agreed to pay the commission as part of a special incentive compensation plan.[23] There is no written agreement, other than the Agreement, that would entitle Boone to a commission on the C–141 aft cowl door contract.[24] Although none of Aeronca's former employees can recall the existence of any agreement to pay Boone one percent of the C–141 aft cowl door contract,[25] Boone asserts that the alleged oral agreement entitles him to a commission on that contract.

For the purposes of the present Motion, the existence of the oral agreement between Snider and Boone will be assumed. Since Boone's business relationship with Aeronca was governed by the Agreement,

Boone's claim for a commission either rests upon the Agreement, the subsequent, alleged, oral agreement, or a combination of the two. Therefore, the terms of the Agreement will be set out and explained below.

## THE WRITTEN AGREEMENT

Under the Agreement, Boone could receive incentive compensation for "earned sales" as determined in Paragraph Six of the Agreement. Three types of earned sales appear to have been contemplated: New Business Sales, Follow-On Sales, and Other Sales. Incentive compensation for New Business Sales and Follow-On Sales can be determined by utilizing certain percentage formulae set out in Paragraph 6.B. The incentive compensation for Other Sales is not set out in the Agreement. Instead, Paragraph 6.D.iv states that "the parties may by mutual agreement establish a special incentive compensation plan for that particular sale, and incorporate that plan by amendment hereto." ¶ 6.D.iv.[26] Paragraph 10 states that "the Agreement constitutes the entire agreement between the parties." ¶ 10. In addition, Paragraph 10 states that the Agreement cannot "be amended or modified except in writing duly executed by" Boone and an officer of Aeronca. *Id.*

The Agreement has in Paragraph 6.D a section which contains the following definitions:

i. "Sale." A sale shall be defined as the manufacture and shipment of products by the Company pursuant to an executed contract with a customer in Representative's territory and shall occur only after such products have been shipped, the customer has been invoiced, and payment for such ship-

---

**20.** Boone Depo. at 60–72.

**21.** Id.; Complaint at ¶ 8.

**22.** Complaint at ¶ 10.

**23.** Boone Depo. at 31–32, 50–55, 77–79, 85–88, 95–97; *see* the Agreement at ¶ 6.D.iv.

**24.** Id. at 77–79.

**25.** Snider Depo. at 8, 15, 17, 29, 64; Ehlinger Depo. at 11, 38, 39; Deposition of Frank S. Kipp Taken on May 7, 1987 at 26, 34, 39, *Boone* (C–C–86–0406) [hereinafter Kipp Depo.].

**26.** Citations to paragraphs are to portions of the Agreement, copies of which may be found as exhibits to the Answer, the Boone Depo., the Snider Depo., the Kipp Depo., and the Ehlinger Depo.

ment is due and owing from the customer to Company in accordance with the Agreement between Company and the customer. An option shall not be regarded as a contract.

ii. "New Business." The term "new business" shall mean executed contracts for the manufacture of specifically identified parts, subassemblies, or components which the Company had never manufactured before the effective date of such executed contract provided, however, "spares" shall not be regarded as new business in any event.

iii. "Follow on Business." Follow on business shall mean executed contracts for the manufacture of specifically identified parts, subassemblies, or components which had previously been manufactured by Company as of the effective date of such contract; provided, however, spares shall not be considered follow on business.

iv. "Other Business." If any potential sales does not clearly fall within the definition of "new business" or "follow on business," the parties may by mutual agreement establish a special incentive compensation plan for that particular sale and incorporate that plan by amendment hereto.

v. "Earned Sale." A sale shall be earned by Representative when the contract for sale is executed between Company and a customer in Representative's territory.

¶ 6.D.i–v.

These definitions are important under the Agreement because they indicate the appropriate commission to be paid on any particular sales effort. Once a sales effort is classified according to the definitions, then the proper method of calculating the commission can be chosen. In Paragraph 6.G, the parties agree to "in good faith endeavor to reach a mutual understanding at the earliest possible time as to the appropriate category into which each specific sales effort will fall." ¶ 6.G. In addition, the Agreement provides that such a mutual understanding as to the proper category will only be binding upon Aeronca when it is reduced to writing and signed by both parties in accordance with Paragraph 10 of the Agreement. *Id.*

According to Paragraph 6.H of the Agreement, "no incentive compensation is payable, even though 'earned' unless or until a sale occurs as defined in Paragraph [6.]D.i above." ¶ 6.H.

Either party had a right, upon 30 days notice, to terminate the Agreement prior to the expiration of the one year term. ¶ 7.B. Paragraph 7.C, however, goes on to provide for incentive compensation payments to be made to Plaintiff in the event that his employment under the Agreement was terminated by Aeronca without cause. Under this provision, Plaintiff was entitled to, *inter alia*, incentive compensation for any

sales resulting from Requests for Proposals (RFP's) which have been received by Company from a customer within Representative's territory as of the date of the notice of termination provided, however, a contract is executed [between] Company and a customer within Representative's territory within ninety (90) days of the date of the termination notice.

¶ 7.C.iii.

Finally, the Agreement expressly provides that it shall be interpreted and governed in accordance with the laws of the State of Ohio. ¶ 11.

### THE MOTIONS

Aeronca, in its Motion for Summary Judgment, asserts that there are no genuine issues of material fact, and, therefore, it is entitled to summary judgment on the following grounds:

(1) Boone is not entitled to a commission on the C–141 aft cowl door under the terms of Agreement;

(2) The alleged oral agreement, even if admitted, cannot be enforced to give Boone the commission because the Statute of Frauds of the State of Ohio bars such a claim; and

(3) The alleged oral agreement cannot be enforced because it was without sufficient consideration to support it either as a separate contract or as a modification or amendment to the Agreement.

Boone, in his Motion for Summary Judgment, asserts that he is entitled summary judgment because the oral agreement is valid and enforceable under the laws of the State of Ohio, and there is no genuine dispute issue of fact as to the existence of the oral agreement. On September 2, 1987, the parties presented oral argument on their Motions to this Court.

### THE APPLICABLE LAW

This Court's subject matter jurisdiction over the present civil action is based on Section 1332(a), (c) of Title 28 U.S.C. because the parties are citizens of different states, and the matter in controversy exceeds the sum of $10,000. 28 U.S.C.A. § 1332(a), (c) (West 1966 & Supp.1987) (a corporation is a citizen of State where incorporated and the State where it has its principal place of business). Although this Court must apply the substantive law of the state in which it is situated, 28 U.S.C.A. § 1652 (West 1966 & Supp.1987) ("Rules Decision Act"); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Federal Rules of Civil Procedure govern the procedural aspects.

■ Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part:

A party against whom a claim ... is asserted ... may, at any time, move with *or without supporting affidavits* for a summary judgment in his favor as to all or any part thereof.

. . . .

... The judgment sought shall be rendered forthwith if the *pleadings, depositions*, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(b), (c) (emphasis added). The party moving for summary judgment has the initial responsibility of informing the district court of the basis of its motion and identifying the relevant pleadings and depositions and other materials that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). Once that burden of production is met, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. at ——, 106 S.Ct. at 2553).

In *Matsushita Electric Industrial Co., v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court held that, after an adequate time for discovery, a non-moving party must establish a genuine issue of material fact to survive a motion for summary judgment. *Id.* at ——, 106 S.Ct. at 1355 (citing Fed.R.Civ.P. 56(e)). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment").

"[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)); "[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

■ All favorable inferences from the pleadings and depositions are drawn in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *White,* 820 F.2d at 101; *Ross,* 759 F.2d at 364. Yet, if a non-moving party bears the burden at trial of establishing the existence of an element essential to that party's case, and it fails to demonstrate a genuine issue for a reasonable trier of fact, then Rule 56(c) mandates the entry of summary judgment based upon the applicable substantive law. *White,* 820 F.2d at 101 (citing *Celotex,* 475 U.S. at ——, 106 S.Ct. at 2553).

In the present case, Boone in his response to Aeronca's Motion for Summary Judgment failed to raise a genuine issue as to any material facts. Although the parties dispute the existence of the oral agreement between Snider and Boone, this issue can be resolved, for the purposes of this Motion, in Boone's favor because the substantive law this Court must apply indicates that the existence of the oral agreement will not change the ultimate result. Therefore, this case is ripe for summary judgment.

The substantive law a federal court must apply in diversity cases is the law of the forum state, including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Kaplan v. RCA Corp.,* 783 F.2d 463, 465 (4th Cir. 1986); *Fortress Re, Inc. v. Central Nat'l Ins. Co.,* 766 F.2d 163, 165 (4th Cir.1985). Thus, North Carolina's choice of law rule applies.

Under North Carolina law, the validity and interpretation of a contract are determined by reference to the state where the contract was executed. *Tanglewood Land Co. v. Byrd,* 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); *Fast v. Gulley,* 271 N.C. 208, 155 S.E.2d 507 (1967); *see also Consul Ltd. v. Solide Enters., Inc.,* 802 F.2d 1143, 1147 (9th Cir.1986) (interpreting North Carolina's choice of law rules). In addition, if the "parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Tanglewood,* 299 N.C. at 262, 261 S.E.2d at 656. The state chosen by the parties, however, must have a substantial relationship or significant contact with the parties, or the transaction, or both. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821, 105 S.Ct. 2965, 2973, 86 L.Ed.2d 628 (1985); *Kaplan v. RCA Corp.,* 783 F.2d at 465.

■ In the present case, the Agreement was executed by the parties in Ohio. In addition, Paragraph 11 of the Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of Ohio." Aeronca is an Ohio corporation, and, therefore, Ohio has significant contacts that make the application of its substantive contract law reasonable. Finally, the parties in their briefs supporting their Motions have both argued that Ohio law applies. Thus, under North Carolina's choice of law rules, Ohio contract law will govern the interpretation and validity of the Agreement.

■ As a matter of contract construction, under the terms of the Agreement Boone is not entitled to a commission on the C–141 aft cowl doors. The written words of the Agreement, when considered as a whole, are plain and unambiguous, and they are the best expression of the true intention of the parties. *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241, 374 N.E.2d 146 (1978) ("where the terms of an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties"). *Crane Co. v. Hicks,* 110 Ohio St. 168, 143 N.E. 388 (1924) ("where a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties"). No reference to external aids or extrinsic facts is necessary. *Johnson v. Pierce,* 16 Ohio St. 472 (1866) (extrinsic evidence inadmissible to explain plain common meaning of words themselves).

Boone's employment as a sales representative ended on January 27, 1987. Un-

der the Agreement incentive compensation for New Sales and Follow on Sales was paid only for "Earned sales." ¶ 6.B. An "Earned sale" would occur when a procurement contract for sale was executed between Aeronca and a customer in Boone's territory. ¶ 6.D.v. As of the time of his termination, no sale on the C–141 aft cowl door contract had been earned because no contract was executed on the program at that time. If the C–141 aft cowl door contract is considered either New Business or Follow On Business then no sale had been earned by Boone on the contract since it was not executed at the time of the termination of the Agreement.

Under Paragraph 7, incentive compensation arrangements are set out that were to be used if the Agreement was terminated without cause by Aeronca. Yet, none of these provisions apply because there was neither

(a) an outstanding earned sale,

(b) an outstanding bid, nor

(c) an outstanding Request for Proposals ("RFP").

¶ 7.C.i–iii.

If either an outstanding bid or an outstanding RFP existed at the time the Agreement was terminated, then Boone would have been entitled to a commission if a contract was executed within 90 days of the termination date. *Id.*

Boone argues that the oral agreement he allegedly had with Snider was a mutual agreement to establish "a special compensation plan" for the C–141 aft cowl doors. *See* ¶ 6.D.iv. Boone asserts that the C–141 aft cowl door contract was one for "spares," and therefore it did not fit within the definitions of New Business and Follow On Business. There is a factual dispute between the parties as to what category is appropriate for the aft cowl doors. Paragraph 6.G., however, clearly states that a mutual understanding between the parties as to the appropriate category for each sales effort, in order to be binding on Aeronca, had to be reduced to writing and signed by both parties in accordance with Paragraph 10 of the Agreement. This was never done, and, therefore, Aeronca asserts

that the C–141 aft cowl doors were not spares.

■ Even if the aft cowl doors are considered "spares," under the terms of the Agreement Boone is not entitled to a commission on that procurement contract. Paragraph 6.D.iv. states that for Other Business, which includes spares, the parties "may by mutual agreement establish a special incentive compensation plan for that particular sale and incorporate that plan by amendment hereto." ¶ 6.D.iv. Paragraph 10 plainly states that the Agreement can only be amended by a writing duly executed by Boone and an officer of Aeronca. This, obviously, was not done with the oral agreement between Boone and Snider, who was not an officer of Aeronca. Therefore, under the terms of the Agreement Boone is not entitled to a commission under special compensation plan for the C–141 aft cowl door contract.

Boone seeks to avoid the above conclusion by asserting that the oral agreement is nevertheless binding as a modification of the requirement that special incentive compensation plans, as amendments, must be in writing. Aeronca, asserts that Ohio's Statute of Frauds makes any alleged oral modification of the Agreement unenforceable because the Agreement itself was within the Statute. Aeronca also asserts that, even if the Statute of Frauds does not apply, the oral modification of the Agreement's requirement that amendments be in writing is unenforceable because that oral agreement was not supported with its own separate and valid consideration.

■ Ohio's Statute of Frauds provides in pertinent part:

No action shall be brought whereby to charge the defendant ... upon an agreement that is not to be performed within one year from the making thereof[,] unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

Ohio Rev.Code Ann. § 1335.05 (Baldwin 1979). Aeronca asserts that the Agreement comes within the Statute of Frauds because it was to be effective on March 1, 1983 and was to run for the term of one year from the date of its execution, March 22, 1983. ¶ 7.A–B. The entire term of the Agreement is in excess of one year, but the Agreement would be "performed within one year from the making" of it. The "making" is the date of execution. Therefore, the Agreement does not come within Ohio's Statute of Frauds. *See generally*, 72 Am.Jur.2d *Statute of Frauds* § 8 (1974). Since the Agreement itself is not within the Statute of Frauds, the oral agreement, as a modification or an amendment, is not made unenforceable because of the statute.

■ Although the Statute of Frauds does not make the oral agreement unenforceable, it is unenforceable because it is not supported by sufficient separate consideration from the consideration supporting the Agreement. "An oral agreement altering or modifying a prior written agreement must be a binding and valid contract in its own right, resting upon some new and distinct consideration." *Richland Builders, Inc. v. Thorne*, 88 Ohio App. 520, 527, 100 N.E.2d 433, 437 (1950); *Heriott v. Marine*, 96 Ohio App. 174, 121 N.E.2d 305 (1953).

In *Thurston v. Ludwig*, 6 Ohio St. 1 (1856), cited in Boone's supporting memorandum, the court stated that

Subsequent to the execution of a written contract, it is competent for the parties, by a new contract, although not in writing, either to abandon, waive, or annul, the prior contract, or vary or qualify the terms of it, in any manner, and where the verbal contract only changes or modifies some of the terms of the original contract it embraces by reference, all the written stipulations of the original undertaking, and is to be proven by the verbal agreement taken in its connection with the written contract. But where a written contract is thus either totally abandoned and annulled, or simply altered or modified in some of its terms, it is done, and can only be done, by a distinct and substantive contract between the parties founded on some valid consideration.....

The general language employed by some of the elementary authors touching this subject, to the effect that the parties to a written contract, may by parole agreement waive, abandon, or discharge a written contract, in whole or in part, or alter or modify any of its terms, has led some to the inconsiderate conclusion that it could be done without any new and valid consideration. This, however, is a mistake. A valid consideration is an essential and indispensable element in every binding agreement. If a written contract be altered by verbal agreement, such agreement must have the essential ingredients of a binding contract; and although it may have reference to, and, indeed, embody the terms of the written contract, yet it must be founded on a new and distinct consideration of itself.

*Id.* at 5.

Boone's performance under the Agreement would not constitute new and adequate consideration to support the oral agreement. *Rhoades v. Rhoades*, 40 Ohio App.2d 559, 561, 321 N.E.2d 242, 245 (1974) ("neither the promise to do a thing, nor the actual doing of it will constitute a sufficient consideration to support a contract if it is merely a thing which the party is already bound to do ... by ... a subsisting contract with the other party"). Boone in his deposition acknowledges that he did nothing for Aeronca in January 1984, the time of the alleged oral agreement, or thereafter to support the oral agreement. Boone Depo. at 56–57. Therefore, the oral agreement that would give Boone a commission on the C–141 aft cowl doors is unenforceable because it modified the Agreement and did not have its own new and valid consideration. The January 1984 oral agreement modified the Agreement because it purported to do three things not provided in the Agreement:

(1) accord Boone a commission on the C–141 aft cowl doors contract that arose in October 1984, ten months after the termination of the Agreement and long after the 90–day period set out in Paragraph 7 of the Agreement;

(2) accord Boone a commission upon the execution of the C–141 aft cowl door contract, whereas the Agreement allows a commission only upon a "sale"; and

(3) allow Boone to orally arrange a special compensation plan; whereas the Agreement states that such plans must be added in writing and signed as amendments to the Agreement.

Therefore, Aeronca's Motion for Summary Judgment will be granted because under Ohio contract law, Boone is not entitled to have the alleged oral agreement to pay him a commission enforced.

A Judgment for Defendant will be entered simultaneously with this Memorandum of Decision.

## JUDGMENT

In accordance with the Memorandum of Decision filed simultaneously herewith, Summary Judgment will be entered in favor of Defendant.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that Judgment for Aeronca, Inc., be entered in the above-entitled action; each party will pay his and its own costs.

This the 28th day of September, 1987.